Good afternoon, Mr. Chief Judge, Your Honors. Tom Dalton is from the Philadelphia DA's Office for the Commonwealth Appellants. I'd like to reserve three minutes for rebuttal, if I may. Okay, I'm not used to seeing you on that side of the courtroom. Maybe more often than I can remember. Robert Lark was convicted 29 years ago of murdering a witness to his robbery, a man named Tai Bong Cho. He threatened detectives. He threatened the prosecutor. You know the facts. Maybe you can help us with the issue. Let me ask, better by asking you the question that I probably should direct to Mr. Lark. Well, first of all, let me ask you a question. My understanding is, although it hasn't been nailed down, this is no longer a capital case that you conceded as to the Sixth Amendment issue of the penalty phase? That is correct. Okay. Does that mean that if we set the matter back, suppose we said no, we don't think that that's in violation, would you, but you're not appealing from the insufficiency of counsel, would you then seek a new trial on the capital punishment aspect of the case? Well, Your Honor, there would be another step, which would be the case would go back to the district court because the district court didn't reach the other guilt phase issues raised by Mr. Lark. But if we were to lose eventually all the guilt phase issues, we would go back to state court. And at that point, we'd have to decide whether or not to seek the death penalty again. It's a difficult decision in these cases. It's often tempered by the realities of trying a case again 30 years later. More than 30 years. Well, 30 years, in this case, after the trial, 35 or 36 years after the crime itself. Let me start with... I'm sorry, so and if if we affirm then I'm sorry, so yeah, it would be a question of whether we'd come back here again. And I understand. Right, right. So if you affirm, then we would go that decision in state court whether to seek the death penalty again would be made in this case. Okay, so it's open as of now. That's correct. And it's not nearly as clear as I don't think any of us would like, including part of the reason is the Swain versus... You know this, I don't know why, but the sound isn't coming through too well. Is that any better? Yeah, it was like breaking up. Okay. It's better now. Okay. A part of the reason for the ambiguity of Rogers' objection may well be the Swain standard at the time versus President Batson's statute. But it looks as though... Let me back up. Apparently, the four days of jury selection, at the end of the length break that appears on the third day, June 7, a new panel was brought in. At that time, the objection is made. And Rogers says, I'm not talking about yesterday or the day before. I'm talking about this last panel that was just brought in here. And the jurors that were struck by the Commonwealth prematurely from that last panel are Sisco and Patton. So it appears to me, and there's some issue because of our first opinion, that the real focus here is on Sisco and Patton and not on the other three. That's what I argued last time, and I agree with that. But last time you lost. Last time I did lose, I wasn't going to point that out. But yes, in fact, last time we lost. I think this Court... Have we foreclosed it? I think... I'm not sure if... I'm trying to remember whether how much of that particular decision was necessary to the decision that was ultimately made. I think the Court found that the Swain objection counted as a Batson objection. That's the larger question, and I think that the Court, you know, is obviously bound by that. I think the subsidiary questions of which particular objections were preserved and which ones were not preserved, I believe might be subject to this Court's visiting them really for the first time because the Court the first time did not make a distinction. It was argued, as I recall, in terms of whether or not Rodgers' statement was sufficient to raise a Batson claim. That is, yes, that was my point then. As to which of the five? All of them, but a backup, our alternative argument was certainly not the ones who were removed the first day. So I made both those arguments. First day or first two days? First two days, although I think the first day it was very short. Nobody was forward. Nobody was slow. So in any event, I did make the argument of everyone before that afternoon. While we're on the subject of what was said, that's part, that's one of the three pillars of evidence that I think the District Court relied on here as evidence of discrimination. And I'd like to discuss that very briefly. As this Court knows, before Batson, in state court as well as federal court, a claim of jury discrimination could only be made out through a showing of jurisdiction in state court, not individual peremptory strikes. Now the District Court concluded when the prosecutor said he was not engaging in systematic discrimination, that was meaningful because it showed he understood the law to mean he could engage in individual discrimination. But the premise is wrong there, because the objection that defense counsel actually raised was a claim of systematic discrimination. And that's what the prosecutor was denying. Now, I know last time as we were just discussing, this Court found that it counted, a Swain objection counted as a Batson objection, but I'm talking about something different. I'm talking about the words that were actually used, the words that to which the prosecutor was responding, and I'll quote it. Mr. Rogers said, this is I think Appendix 668, 669, he asked for records to be preserved, quote, to preserve an opportunity for me to challenge that the Commonwealth may in fact be excluding all blacks who came before this panel. As of this afternoon, your honor, he is striking all blacks. And Mr. Carpenter said, oh, how awful. I'll get to that in a minute. And the next page, Mr. Rogers says, he's striking blacks, not saying he did it yesterday. As of this afternoon, he's striking blacks. Later, a couple pages later, Mr. Carpenter says, it's, quote, obviously not systematic discrimination when you've got three members out of the nine who are the same race as a defendant and his attorney. Now, the words that were used as the objection were an objection to systematic discrimination, not to any particular strike. So when the prosecutor denied systematic discrimination, he wasn't somehow tipping his hand about his intent to discriminate against individuals. He was responding to the accusation that was being made. No, I am not systematically excluding African Americans. Well, but systematically in this context, it related to action over a number of cases. I mean, you could say, well, it's still a Batson situation in a particular case if you're systematically just excusing every black juror. Absolutely, Your Honor, and I think that's why this Court last time held that that counted for our purposes as a Batson objection. But the point I'm making is something different, which is that the objection did not single out any particular preemptory strike, and that Mr. Carpenter's reaction, saying, I am not systematically excluding blacks from the jury, was actually an appropriate response to the accusation that was actually made. But it's possible, isn't it, that Mr. Rogers was thinking individually rather than systematically when he made that statement? It's possible that he was thinking that, but that's not what he said. But was there any focusing on any particular juror? For example, he excused juror X because he or she is black. No, there was no discussion of any particular juror by either Mr. Rogers, who was doing the objecting, or Mr. Carpenter, who was defending against the accusation. So, Batson was decided while this case was on appeal to the State Supreme Court. In order to make a Batson objection before the Supreme Court, before it decided, would the defendant's attorney have to have anticipated Batson at the trial and made an objection on Batson grounds, even though it hadn't been decided yet? Or would you say, well, he didn't raise it in the district, I guess, the Common Police Court. He didn't raise it in the Common Police Court, and therefore he didn't preserve the issue. Well, Your Honor, this Court has said, and I believe the Supreme Court has said, that a Swain objection encompasses a Batson objection. So, the issue of... So, if you made a Swain objection, after Batson came down, you could argue Batson. Right. That's right. Let me get to the particular phrase that was used by the prosecutor during this exchange, the oh-how-awful phrase, which has been a subject of debate and discussion for several years now. The language is sarcastic, but as I described in my brief, that was sort of typical of both sides in this trial. But the more important point is this. If he's admitting to something by saying something sarcastic, oh-how-awful, what is he admitting to? At most, he's admitting to the accusation. Again, this afternoon, he has struck four blacks, and he's making that admission, if that's what it was, in the context of defense counsel's concession, that he wasn't striking blacks the day before. But, you know, given what was said subsequently, and this is another issue in terms of credibility, that's clearly an interpretation you can get from this record. But the district court here could have looked at that interpretation in context with Carpenter's subsequent testimony before the district court and join a negative credibility inference from that, because before the district court, he basically said that any kind of discrimination, basically, although he didn't say any kind, was abhorrent to him, he was an Episcopalian minister. If what you're saying is the interpretation that the district court gave it, that is inconsistent with his testimony before the district court later on. Well, yes and no. There are really two things going on. First, he's saying, I think, a translation of what he's saying is, you know, to be sarcastic, okay, I'm guilty of selecting a multiracial jury, and my last four strikes happened to be four black jurors. He's saying that's not a significant fact. Now, you can look, it's not significant either under Swain. It's clearly not significant under Swain, and I think that's the point Your Honor is getting to. But I think in addition, it's not significant. It's not necessarily significant under Batson. I mean, it could still, Batson's different, obviously, and, you know, if there's a case made of it, case made out of any of those four jurors, it could be the basis for a Batson claim. Why wouldn't it be significant under Batson? I'm saying it could be, but what he's saying is it's not significant, and the same argument could be made now under Batson. If I'm a prosecutor, and I've selected, so far, a multiracial jury, and my last four peremptories happen to be against African-Americans, I could say that's not significant, and it would be the same. So we're not, in other words, maybe before I was imprecise, it's not so much that he's denying only a systematic claim of discrimination. What he's doing when, just with respect to the, oh, how awful comment, he's saying, saying that with respect to those four jurors, your accusation, whatever it is, is not significant. And how do you, how do you read the District Court's interpretation of that particular comment? I think the District Court was more, was concerned generally with the state of law before Batson, and the thinking was that before Batson, it was, it was, if the prosecutor wanted to discriminate, he could do so, thinking that he only had to select, say, one black juror in order to avoid any accusation of systematic discrimination, and I think that the District Court was focusing on that, and was sort of using that as an inference that Mr. Carpenter thought he could discriminate, and was essentially by saying, oh, how awful, saying sort of what your Honor was suggesting, that he was saying only that systematic discrimination is not something he had done. But it doesn't, A, that, as I was saying before, that the, oh, how awful comment simply means it's not significant under whatever legal theory, but B, if we're really going to look at pre-Batson law, I think, in fact, the better inference, the common-sense inference, is the opposite, because if he only thought that he had to take one black juror, which is what the facts were in Hardcastle, he could have stopped at one black juror, but there were four black jurors in this case. Well, I'm going to explain it, unless I'm mistaken. You could intentionally strike all black jurors from a given petty jury, as long as the array had enough black jurors to potentially let you get to a black juror being, be seen for a veneer stage. You could, when you get to the veneer stage, you could then strike everybody based upon a race, as long as the array was not played around with. That's how I think many people read Swain and Henderson. I'm not sure, I can't say in practice, whether that's what people thought. I think that in Hardcastle, Judge Padova seemed to think that that the reason why Ms. Rubino in Hardcastle was taking notes was that she wanted to be sure that she had seated one black juror. So, that, I think, in Hardcastle was the basis of the pre-Batson law argument. But I'm saying in this case, even that interpretation of pre-Batson law doesn't work. I mean, it doesn't, it doesn't constitute evidence of discrimination on the part of the district court. Really, it's one of my concerns. Does the district court look like he was not anxious to get into this question at all and didn't really hit it head on? And if it goes back, not saying it will, but if it goes back, not even saying it should, is that something we should ask the district court to do? To look at that statement and tell us, given the opportunity he had to observe Mr. Carpenter at the hearing, tell us how you interpret it and what conclusion you draw from it. Obviously, the court could do that. I think, as I said, given the circumstances of the jurors that he actually did accept, I don't think that that's strong enough evidence at this point to justify invalidating the conviction all these years later. So, in other words, if you looked at the other kinds of evidence and decided that they were not sufficiently probative, I think sending it back just for that would not be enough. Counselor, we remanded this case, we reversed it, and we told the judge to get to the third stage of Batson where he has to make findings and the burden of proof would be on the defendant. And the judge made those findings. And if I had read the opinion, being that judge, I would have looked at all the people, the five people involved. So, in that sense, we're having this discussion. But is there a function now to see, the judge did what we told him to do. To see whether or not the evidence supports what he concluded. Not that we would have ruled that way. Maybe we would have, maybe not. But isn't that the function of the court at this point? I think... See, I think we sort of put the law out of it in that sense. We said, this is what to do. Find these facts and find whether there was a discrimination in this jury selection. And if there was, as I understand it, even to the excusing of one juror, then we grant, we affirm the grant of the writ. I think you're right that the dispute as it stands now has to do with facts more than law. But two things, there is obviously an intersection of the two and I'll talk about a little bit more. But second of all, the standard of review, which I think is really sort of the crux of your honor's question. There is a lesser standard of deference applied to Batson findings made years after the trial by a different judge. And I say that for the following reasons. At all stages or just at the second stage? At the third stage. I would, because the third stage is the factual stage. That's the stage that we would usually deal with a clearly erroneous standard. And my point is that that ultimate question of whether or not the claimant has proven by a preponderance of the evidence that a discrimination occurred, that would usually be subject to a clearly erroneous review. What is it now? What should we be applying? I think it's a lesser standard of review. I've quoted in my brief that the Seventh Circuit's decision in Holder v. Wellborn, which says it's de novo in a situation like this. But whatever it is, it's lesser. And the reason I say that is the following. First of all, this Court, along with the Supreme Court, has recognized generally the potential for error in a case like this. If you look at Abu-Jamal, a case that I quote throughout my brief, at one point the Court in Abu-Jamal quoted the Second Circuit saying, it's nearly impossible for the judge to rule on a Batson objections intelligently, unless the challenge juror either is still before the Court or was very recently observed. Second of all, the Court has specifically recognized that less deference is due. And for this, I direct the Court's attention to Riley v. Taylor in Bank decision, the plurality in that, in which the Court said when reviewing the Batson hearing in State Court by a different judge seven years after the trial, quote, we decline to give these findings deference. Such deference is ordinarily based, at least in part, on the original trial court's ability to make contemporaneous assessments. And third, there's nothing contrary from the Supreme Court. The Supreme Court has never even faced a Batson hearing like this that happened years after years after trial. And in Taylor v. What about Anderson, where the Court talks about using clear error in terms of a civil context, and this is a civil proceeding, and that findings of fact should not be set aside unless they're clearly erroneous. I think generally that is the rule, but I'm not sure, did Anderson, I don't recall if Anderson involved a hearing that was long after. No, it didn't. But see, the problem is it's almost like Hamlet. It's kind of a play within a play. And to the extent you're arguing deference and clear error should not apply to findings of fact that happened back when the initial hearing, it wasn't a hearing, but back when the initial procedure took place and what Carpenter's mentality was then, that makes perfect sense to me. But to the extent that you're arguing that we should not afford Judge Padova some deference when he had the opportunity to observe Carpenter's demeanor when he answered questions about this, that makes much less sense. I do think, and it's the law, but I do think the whole concept of deference based upon opportunity to see witnesses and read the body language is given a lot more credit than it deserves, but that's the law. Well, I'd say in addition to that overarching point, I would say a couple other things about this particular hearing that we're talking about. Number one is that Carpenter, Mr. Carpenter, did not in fact remember most of what was going on. But that's a credibility question. If he says, if I today say I don't remember what I did 30 years ago, I may or may not remember what I did 30 years ago. And Padova's ability to observe Carpenter when he sees him saying that, to me, that's something that we should give deference to because that's something Padova, using that whole body of law that again is there, he could preserve his body language. Although I would say that I don't think Judge Padova found that Mr. Carpenter didn't, was lying when he said he didn't remember. I mean, Judge Padova found that Mr. Carpenter was actually being candid, I think, with respect to that. So what we're left with is a record comparing jurors and Mr. Carpenter's sort of speculation as to the various factors he used. That's exactly the kind of assessment that this court can make, and any reviewing court can make, just as well as the district court. You may want to finish out that, but if not, I'd like to ask you about some of the comparisons. Please, go ahead. Particularly Florence Williams and Lisa Patton. Where, where's the error there in that evaluation by Judge Padova? I'm glad Your Honor raised Lisa Patton because as I was preparing for this argument, I saw something, I might maybe, maybe I've mentioned it before, in one of the briefs or somewhere. It's hard to remember it all, but that, for Lisa Patton, who was a black juror, who was struck by the prosecutor, Mr. Carpenter said at the hearing that he believed that Ms. Patton might have had a rapport with defense counsel. He couldn't, at the hearing, Mr. Carpenter couldn't identify anything from the record that would support that, although he had a general feeling that that was something he was concerned about with Mr. Rogers in particular as a defense counsel. But in fact, there is something in the record that does. Ms. Patton, remember her, she had two uncles who were police officers. And at one point, she even, she said she might be tempted to believe police officers' testimony more than lay witnesses, which obviously would make it her, a favorable juror for the, for a prosecutor. But it's the defense who rehabilitates her. Mr. Rogers works very hard to say, no, but you would, you would obviously be, be very careful about that. You would obviously follow the instructions. You would obviously think that lay jurors were just as worthy of belief as police witnesses. And she agrees with him. The defense is the one that rehabilitates her, indicating that the defense saw something in her that he liked, or that the defense lawyer was establishing a rapport. You lost me there. I mean, that's the kind of kabuki dance that takes place in 90% of the void years that occur, especially in capital cases. You get the person who says I'd be inclined to believe an officer just because the police officer, the DA tries to walk them back from that to avoid a challenge for cause. The defense attorney then tries to get them to walk back toward it to get a challenge for cause. And then one side or the other, depending on whose last dance it is, exercises a peremptory. But to the extent you're arguing that that builds rapport in, if that's the case, then we've got nothing but 12 jurors with incredible rapport with one side or the other, because that's, that is exactly the dance that occurs in any kind of wide year. Well, I agree with you that it's not, you know, what you call a kabuki dance. It's very difficult at this point to be, to be specific, but that's why, you know, Judge Edwards in the D.C. Circuit called this entire kind of comparison thing farcical. I mean, it's, it's, it's, you know, we're talking about a very important conviction for both sides from 30 years ago, and we have to do the best we can. Before we leave Ms. Patton, I do also want to say a couple of other things. The one comparator juror that was used by the District Court was a young woman named Philomena Cayonne, because both of those jurors were young. But remember, Ms. Cayonne went to Catholic High School and Catholic College, which Mr. Carpenter said was important to him. Mr. Carpenter said that while they were both young, since Ms. Cayonne had spent several years out of the country, she, he thought that was a sign of maturity. Ms. Patton was also from the general neighborhood of the crime, I think is what, Oak Lane, but I think that's what Mr. Carpenter said. Those are actual, plausible race-neutral reasons. Now, you can find, if it's right, if the jury selection is happening right in front of you, I think there's a lot more leeway for the trial court to say, I don't believe you, you know. That's a good point. My problem is, and it's endemic in this kind of exercise, that the argument that you're making based upon tediously going through and meticulously looking at the record, if something had Carpenter said it and had the, Mr., had Judge Badova accepted it, it would have been perfectly fine. But if Carpenter doesn't say, and I'm assuming that he had the same opportunity to review for his testimony that you had for your brief, if he says, I can't recall what it was, why should we then allow counsel on appeal to come in and basically substitute your reason for what he could have said for what he actually did say, and what he did say was, I don't know, there's nothing here that I can come up with. Well, I think that's putting an awful lot of pressure on Mr. Carpenter, who after all is a retired gentleman who didn't have a lot of time to spend or didn't have a lot of, didn't spend a lot of time reviewing, you know, these hundreds of pages. If you look at the record, the hearing before Judge Badova, the discussion of each juror was really brief, and especially at the beginning of that hearing, I was having trouble even being allowed to ask Mr. Carpenter to speculate at all. By the end of the hearing, I was being given a little bit more leeway, but the court was not real patient with the whole thing, because thinking that we can do that just as well as he can if he doesn't remember, which I think there's a point to that. But on the other hand, it means that if Mr. Carpenter didn't necessarily see it in those few seconds that he was testifying about that particular juror, I don't think it justifies throwing out the whole thing. My time is up. I would like to just briefly talk about that one other juror. Florence Williams. Exactly. The district court compared Florence Williams, the black juror who was struck, to Ms. Petruzzelli. Florence Williams went to a non-Catholic public high school. So what is the significance of Catholic schools? I see that is it thought that people who went to Catholic schools are more likely to convict? Basically, I think that's what Mr. Carpenter said at the hearing. You know, these are peremptory challenges, and I always feel a little bit awkward defending them, because a lot of them don't make any sense. But I think any lawyer who has done a lot of jury trials will tell you that some of their peremptory challenge rules don't make a lot of sense. I think with respect to Mr. Carpenter and Catholic schools in particular, one thing is that Mr. Carpenter trained as a minister. That might explain why it was important to him. I can't tell you, Your Honor. It didn't make him any less likely to convict. True. Ms. Williams had two kids, one minor child living at home. Ms. Petruzzelli was much older, had three kids who were all grown and out of the house. And the thing with Ms. Williams is that the defense counsel asked her no questions at all. Nothing. Which again suggests that he saw something too. Now, can I be sure of that 30 years later? Your Honor, obviously not. But that's got both ways. He may have seen something in the interaction with Carpenter that told Rogers, I'm not going to, the only thing I can do here is blow it. Because she might say something in response to one of my questions. It's going to shoot out something that's going to be a strike for cause. I'm keeping my mouth shut. That's very possible. That's very possible. But the question is, ultimately, and I'll sit down, we can point to objective race-neutral reasons in the record for each one of these strikes. We can point to objective race-neutral distinctions between the jurors that are being compared for each one of the comparisons used by the district court. Not just one, I mean many differences between the jurors who are being compared. And the question is, okay, with that kind of lack of reliability, with that kind of guesswork, which we have to do because it's 30 years later, is, does that justify overturning this conviction where there's no doubt, there's really no doubt, not only of Mr. Larkinskill, but that it was a multiracial jury that heard the case in the final analysis. I'll sit down while the other side argues. Thank you. Thank you. Good afternoon, Your Honor. Stuart Lev on behalf of Mr. Lark. Let me start with one of the points Judge Greenberg made in talking to Mr. Dolginus, and that is you sent it back for Judge Padova to do a step three analysis, and that's exactly what Judge Padova did. The essence of a step three analysis, particularly in an old case like this, is to look at the totality of the circumstances, and to look at everything, and to analyze everything with due regard for the fact that Mr. Carpenter's memory had faded, and with due regard for the fact that time had passed. This court said the last time we were here that there are, that this court takes that into consideration, and Judge Padova clearly took that into consideration. And like you said, Judge McKee, he did have the opportunity to listen to Mr. Carpenter over two days, and I disagree with my friend at the table over there of Judge Padova lacking patience. I think Judge Padova was incredibly patient and gave the commonwealth. Of course, had you lost, he may have been more impatient than... I'm sorry? Had you lost, he may have appeared more impatient than he appears in victory. I would have complained about him allowing the commonwealth as much leeway as they did to speculate as to what the reasons might have been for the strikes. But I wouldn't have questioned Judge Padova's patience, I don't think. Maybe so. But so I think that Judge Padova did what district courts do all the time. District courts are fact finders. Appellate courts review those fact finders. And the standard is clear error. And I think when Mr. Dolginus went through cases that said it's not so much a clear error standard, but you didn't hear where any Third Circuit cases. Because the law in this circuit is very clear. In Wilson, an old Batson case, applied a clear error standard. In Hardcastle, when it came back up, albeit in a non-precedential opinion, it rejected the idea that there was some standard other than clear error. And that's consistent with the roles of the appellate court and the district court. If it wasn't for the district court to make fact findings, your honors, I remember we talked about this the last time we were here. Should you send it back or should you make the step three finding? And we had that discussion in the last argument. And I think ultimately you sent it back because you realized that's the appropriate way that fact findings get made by a judge. The step three determination, that five jurors were selected as a product of purposeful discrimination, is a fact finding and it's a credibility finding. As you view this matter, it's not that complicated then. That while we could pick at certain things that are said, in general, you would view it that the evidence supports the facts as found. I think that's exactly correct, Judge Green. And that ends the story. That if you agree with me that it is a clear error standard to be applied, this is not a difficult case. Because the question is, did Judge Padova commit any errors of law? And I think Mr. Dolgen has quite candidly said this is not a legal question. There are no errors of law at issue here. And were his fact findings have support on the record? And there's no question that there is support on the record for his fact findings. Judge Padova created this very extensive chart that looked at each juror that had multiple factors of all the questions and concerns and the characteristics of the jurors and used that as the basis of his comparisons. So, but it wasn't just one thing and that's the important. It was the statistics. In their briefing, the commonwealth tries to downplay the statistics, but the statistics here are stark. 13 out of 15 strikes. An 87 percent strike rate of African-American jurors compared to a 13 percent strike rate of white jurors. But that 87 percent, by that means that of the universe that you're reviewing, you're striking 87 percent of them. That's correct. And if you look at the opportunity that that Mr. Carpenter had to we presented the race and gender of 29 jurors that Mr. Carpenter had the opportunity to accept and strike. So we can look both at the strike rates and the acceptance rates. So we can put them in context. We don't just have the simple 13 out of 15. We also have the acceptance rates. And what we see is that he's striking African-American jurors 6.7 times greater than white jurors and accepting white jurors 3.6 times more than African-American jurors. Now, I'm not saying by itself the statistics establish discrimination, but that's clearly a factor that's permissible for Judge Padova to put into the mix. Then Judge Padova goes on and in this in this difficult session where Mr. Carpenter doesn't remember and so he talks about the factors he usually uses in jury selection. He looks at all those factors and how they were applied. And how they were applied, were they applied in a racially disparate way? And he finds that as to 6, there at least appears to be racial disparities in the way factors such as age and children and homeownership were applied. What do we do with mistakes that were made? Like the woman who said that she used to live in North Philadelphia, but now she's in Northern Liberties and some people might consider Northern Liberties North Philadelphia, some people may not. But Judge Padova saw that as a contradiction in the explanation, whereas on the face of it, I'm not sure that's at all a contradiction of it. It's not the heart of North Philadelphia, but it's certainly Northern part of Philadelphia. Again, I think that's true. You could argue about that. And so Judge Padova can take into account all of the other factors that he sees of a juror who's who appears to be everything that Mr. Carpenter says that he likes in jurors. Older, stable, homeownership, employed, roots in the community, and he can weigh that against that kind of how do you how do you view Logan? I think it was Logan versus versus North Philadelphia. I always see Roosevelt Boulevard separating Logan from from North Philadelphia, but it's I agree. It's open to the discussion with that. That's why he looks at the totality of the circumstances and he makes the comparisons. I think when you look at what Judge Padova did in his juror comparisons, he was extremely careful and cautious, right? It was only when jurors had had a number of similarities that he would consider them as comparative jurors. And if they didn't have enough or if they were if they were picked at a different stage in the process, he would not consider them similar. And and so he was careful, far more careful, I think, than if you look at what the Supreme Court did and said in Miller L versus Dredke. They based their comparisons based on one factor of the juror. And I think it was Justice Stevens who wrote the majority opinion. But the majority opinion says we recognize that our comparative jurors have some similarities and some differences. But they weighed that and Miller L is another case, is a case with the Supreme Court 20 years after the trial and 18 years of the hearing where the prosecutor testified was held three years or two years after the trial. So 17 or 18 years after the trial. The Supreme Court did what Judge Padova was doing in making those juror comparisons. And I think if you look carefully at Dredke and you look at what he's he's extremely justified in making the comparisons that he did. In making those comparisons, did he did he ever fail to tie them all together for each individual? That is, was it was it too compartmentalized or I don't think so, because I think that that he looked at the jurors as a whole. For each one, when you when you read his ultimate conclusion, he looks at the reasons that might have been led, if there were any reasons given, like with Florence Williams that Your Honor mentioned, with Mr. Dolginus. Even reading through the juror notes, he couldn't come up. There's nothing in in her examination that's that's remarkable at all that would explain why he would strike her. Another thing, I was reading Dredke yesterday and another thing that that struck me that's not emphasized so much in the briefs, is that the court in Dredke says that they're very suspicious of prosecutors who don't ask questions before they strike. Who, if they have an area of concern, they expect prosecutors will ask questions about that area of concern, much the way Mr. Rogers did about Lisa Patton. I'll come to that in a minute. And here, there were several strikes that Mr. Carpenter made without asking any questions. So not only isn't there anything in the record, but there's nothing in Mr. Carpenter's voir dire that indicates any concern about any particular factor that that might lead him to exercise his strength. To what extent did Judge Padova consider, that's a strong argument, but to what extent did Judge Padova consider that? Sounds like that was not part of his calculus. It's not explicit. Whether he considered it and it's not in his opinion, I can't say. But yes, that part is not within his calculus. But I think in looking for clear error, it's certainly something that this court can look at to see if that further supports the kind of findings that Judge Padova made. I don't rely on that. I mean, there's plenty in the record, as Judge Padova showed, in each of the four factors he relied on, in the statistics, in the comparative use of and this court did that same kind of comparative use with just one reason in Holloway. You looked at age and saw how age was applied to African-American jurors, youth, but not to white jurors. And that supported the decision in Holloway. Here, Judge Padova went, looked at all the factors so he could weigh it in the totality of the circumstances. And I think that's what carries. Were the proper, were objections lodged for all of the five individuals that we've been talking about? And if so, were they the right kind of objection? Well, well, It doesn't make any difference. That's a difficult, I think, interesting question. We know he lodged objections. He said in this past panel, I'm objecting. He's striking all the blocks, and he's not talking about the priors. So, of course, there's no specific objection to the priors. I'm not sure Batson requires a specific objection to each juror, because the object of Batson is to raise an objection when a pattern appears, and so the lawyer says, I'm not saying you did it before. That is a different scenario. That could be, but it seems to me if you raise an objection as to the striking of an objection to cover the jury selection as a whole. And I don't think any of the Batson cases from either this court or the Supreme Court require that. But even if we just limit it to Lisa Patton and Sisko, the other jurors are relevant to established motivation. This court has said that, and the U.S. Supreme Court has said that, and both Snyder and Dredke, that you can look at how the prosecutor treated other jurors, and if you think there's motivation in some, racial motivation in some, that is evidence that there could be racial motivation in other strikes. So even if there's no specific objection, the strikes of Sampson and Williams and Green are also relevant to the question of the strikes of Patton and Sisko. So either way, I think Judge Padova's findings are well supportive. Whether you consider the objection to the jury's process as a whole, or just to the specific jurors. If you do consider it just to the specific jurors, I think that undercuts Mr. Dolginus's argument that they were talking about systemic discrimination. Right? That if it's only limited to those four or five jurors who were on that panel, then he's making objections as to specific jurors. And Carpenter's statements, oh how awful, and I haven't struck all the blacks, isn't responsive to those strikes about those specific jurors. I want to talk briefly about Lisa Patton, and then if I still have time, about the statements at the end. I think Lisa Patton is is a particularly telling strike in this case. Because when you read Lisa Patton's testimony, she is a prototypical prosecution juror. She comes from a police family, a very stable family. She's a student at a good college. Well, that may not cut in the prosecutor's favor. I mean, I'm not sure the prosecutors want students on the jury. But they took Ms. Cayonne, who was a student. So clearly that wasn't a problem for this prosecutor. She had difficulty with the question about whether she would give more weight to a police officer testifying than to a civilian. And Mr. Rogers questioning her about that isn't rehabilitating her, isn't establishing a rapport. It's trying to understand if there's grounds for a challenge for cause. It's trying to understand what her real feelings are about that issue, and how she might explore that issue when it comes to trial. It's certainly a very legitimate grounds that I think any defense lawyer would ask follow-up questions on, and you can't find a negative inference from that. This is a prosecution juror, and Mr. Carpenter didn't ask her any questions. He didn't wait to see whether it was his turn up. He wasn't responding to what Mr. Rogers did. His turn up to strike, and he struck without asking any questions. And you look at that, and really the only reason, the only reason that jumps out at you about why that is a strike is because of race. And I think Judge Padova was perfectly within his rights, and perfectly correct. Defined that. Let me go back to Mr. Carpenter's comments at the end, because if it is specific, it is, if it is specific objections to four people, then his comments are even more telling, because he's, he's ducking the question. But, but I tend to agree some with Mr. Dolginus, that I think what, what Judge Padova was looking at, and Judge Padova did not specifically address the oh how awful comment, and what it could mean, and which way you take that. But I think what Judge Padova was looking at is, is did Mr. Carpenter have a knowledge of the law at the time? And at the time of this jury selection, the law allowed him to make individual strikes on the basis of race. And Mr. Carpenter's response about, I'm not, I haven't struck all the blacks, I haven't, you know, it's not a systemic exclusion, is consistent with the finding that Mr. Carpenter knew the law. Mr. Carpenter was an extremely experienced trial lawyer. Yes, that's what he said, Judge. He also said he had a lot of cases in the career criminal unit, which were not capital cases. You got one? Yeah, so um, but, but Judge Padova was clearly within his rights to, to presume, to find from his comments that Mr. Carpenter understood the law, and that he acted in accordance with that law. And so he said he did, because he said he never struck a juror because of race. Well, but at the time of this trial, Judge Greenberg, the law was he could strike a juror. Yeah, but he made it clear that he never did that. If you accept his testimony. Yeah, that's what I'm saying, that's what he said. That's right, and Judge Padova did not have to accept his testimony, and he didn't. Because his step three finding, that there were five strikes that were a purposeful discrimination, indicates that he didn't accept. You know, I wondered about that. I thought about it a lot. A prosecutor may think that he or she is not excusing because of race, and yet it may be that they are. In other words, your assessment of yourself might not be right. I could see that. I think that's correct, and if I remember right, Judge Greenberg, and I can't be sure my memory is clear, but if I remember right, I think Batson even referenced that, that the, that the reason why you can't just take a prosecutor's answer, I wasn't striking on race, as a race-neutral reason, is because the court recognized that there may be unconscious factors at play, and I think that's what I hear you saying, Judge Greenberg. Well, we've clearly said in the Title VII case, when Judge Carpenter, when Judge Carpenter, when Mr. Carpenter said she looked like someone who could follow directions, and that immediately jumped out at me, because I'm not sure that had this person had dreadlocks, and a darker complexion, she would have looked like someone who could follow directions. It jumped out at me that way, too, Your Honor. So, in the end, it's the totality of the circumstances, and in the end, the record clearly, there's record support for all of Judge Padova's findings, and, and that should be the end, but, but I just want to say this when I end. It's, it's, to me, this isn't just a clearly erroneous ruling. Judge Padova is correct. When you look at this, as a whole, when you look at the, the numbers, the numbers he had, there was a majority African-American jurors, 17 out of 29, that he had the opportunity to accept. 60% of the jurors he had the opportunity to accept or reject were African-American, and he ends up with just four. Gets that, that magical 8-4 split that, that some prosecutors, maybe not just Mr. Carpenter, but some prosecutors in Philadelphia thought was the right split to have in a jury. He, he gets that split by, by striking such a large percentage of jurors, and you look at all the comparative factors. This is discrimination, and, and but when it is, it stains the system. It stains how the public looks at the system, and even though this case is old, and even though the facts are serious, there's no doubt, we can't allow that stain to be on what happened in this case. We have to remedy that stain. We can't allow discrimination to play a part in these criminal convictions, regardless of the age, and regardless of the facts of the case. If you lose on this case, and somehow it's determined there's no Gadsden violation, you had other issues, didn't you, that would have to then be addressed? Yes, there are, there are still some ineffective assistance of counsel issues that... At the guilt phase? At the guilt phase. That would need to be addressed and ruled upon. So, I urge you to, to look at what Judge Padova did to find that it's not clear error. And to affirm his findings.  I'll try to be as brief as I can. I do want to... We're not jumping on the red light, so don't worry about it. Thank you, Honor, and I appreciate it. I do want to clarify that I think there, there was legal error here in the sense that relying on non-probative evidence for concluding that there's discrimination is legal error. And, and I, I, I take that language, non-probative evidence, again from, from Miley v. Taylor, where this court, a plurality in bank decision... What is the non-probative evidence that he relied on? All three. The, the, the statistical evidence, which I want to talk about, the statistical evidence, the juror comparison evidence, because of the jurors were not similarly situated, and the the reaction of the prosecutor at the time of the, at the time of the objection. What do we do then? Send the case back and tell the judge how to consider the evidence, or do we just reverse and deny the writ on this basis? I think what, I think what the court should do is reverse on the basis that the evidence as developed in federal court is simply not, not probative, not sufficiently probative to find a Batson violation. But we would end the Batson inquiry. Right, and then we would go back for the ineffective counsel claims at the guilt phase. Mr. Bisson, I know you want to make a point, and I'm going to let you get to it without further interruption, I hope, but there was a great deal of discussion that Mr. Carpenter seemed to provide in terms of Rogers' attractiveness. I guess that's the old eye of the beholder scenario. But he didn't seem to have the same concern about potential the attraction between young white jurors and Carpenter and the Rogers, and we do have a case, Jones v. Ryan, that says if you're going to apply that concept of attraction, you can't apply it only on the assumption that a black woman would be attracted to a black man and a white woman would not be attracted to. Just that business about the concern with attraction, how would you respond to that? He didn't seem at all concerned about the young white woman being concerned. A couple, a couple of points. Actually, there was one, at least one white female juror that in, while Mr. Carpenter was being cross-examined, I think Mr. Wiseman asked him, well, what about rapport? Isn't there a rapport here? And what Mr. Carpenter said was, I assume so. Rapport is different, then, because there was discussion about rapport, and that came on with the rehabilitation. There seemed to be different discussions, and a different juror with the concern was not necessarily rapport, but attraction, and Carpenter even said that he thought Rogers had been a male model at some time or modeled men's clothing. And to me, that dust of rapport is totally fine. Anybody would be crazy to not be concerned about the other side having rapport with a potential juror. Attraction, though, if that's the calculus, it seems to me to assume only that, well, black women would be attracted to this guy, but a white woman's not going to be attracted to him because of the cross-racial disconnect. That would seem to be a problem. Well, actually, I have to disagree with you. I think when Mr. Carpenter was talking about rapport, that's sort of what he meant. That sort of encompassed what he was talking about, attraction, and he was an attractive man, that kind of thing. With respect to, I agree, it's sort of a tricky point. But let's pause it for a second, and I think if there's no basis for it, and the prosecutor says, is looking at interactions between a black lawyer and a black prospective juror, and there's no basis for thinking there's a special bond between them, and the prosecutor says, I struck because I thought there was a special bond. I think that's discrimination. I mean, I think that's the kind of thing that a trial court can see in front of it and say, well, you're making that up. I didn't see any of that. On the other hand, if it's true, it's a race-neutral reason. There's a third possibility that... True based upon some objectively observable... Right, and if, and it's, let's say the racism is coming from the other side. Let's say the defense counsel is trying to be especially friendly to black women. Then the prosecutor is put in a position where it's sort of a race-based strike, but for race-neutral reasons, if that makes any sense. It does. I'm not sure that's undirected, but what you're saying makes perfect sense. So, you know, there's a lot of moving parts here, and I don't think, I think Mr. Carpenter's concern with Mr. Rogers was something that came out really clearly at the hearing. He said it again and again and again, and frankly was the first thing he said to me when I called him up. I mean, that's, that's, he didn't remember this, this trial very much, but he did remember that about Mr. Rogers. Yeah, and again, it comes back to, is that kind of guesswork enough to overturn this conviction? I, if I can, I'd really like to get to just very briefly these two, the two types of evidence that I think, two of the three that are not probative. Juror comparison evidence, I've already talked about that. Mr. Lev brought up the Supreme Court cases. You know, in Snyder, the Supreme Court compared one characteristic among three jurors and noted explicitly that the state court had thoroughly explored the same comparison. One characteristic, three jurors that had already been explored. In Miller L., the Supreme Court compared two black jurors to a small number of white jurors and explicitly found the differences were far from significant. What the district court does here goes far beyond anything that the Supreme Court has approved of. The district court compared, you know, all the black jurors using a dozen or more criteria, especially the racial variances analysis, which I don't even know what the point was. I don't even know what the legal consequence was. You know, he went, Judge Padova went through and said, well, this particular factor, say age, I find was applied differently among different jurors of different races. Ignoring anything else that could account for the difference in treatment, completely eviscerating the similarly situated requirement. I think that is just completely improper. The comparisons thing is a much closer question, but the racial variance among factors, I've never seen anything like that. And I think as a matter of statistical science, it doesn't make any sense. So that's number one. With respect to statistical evidence, and I'll end on this, you know, my basic point with respect to the statistical evidence is that the statistics here are materially identical to four cases that this court has said those statistics are inconclusive. And I'm talking about four primary statistical measures. Strike rate, exclusion rate, acceptance rate, and representation of African-Americans on the jury. He's, Mr. Lev really only talks about a strike rate and acceptance rate, but let's talk about other things as well. Representation on the jury. There were four African-Americans on this jury. That's more than Lewis, which was allegedly an all-white jury. That's more than Abu-Jamal, where there were three black jurors. That's the same as Bond, slightly less than Williams. Acceptance rate. Mr. Carpenter accepted about a quarter of the black jurors he had a chance to accept or reject. That's more than Lewis, where apparently there was a 0% acceptance rate. That's the same as Williams, which was a 26% acceptance rate. And it's about the same as Abu-Jamal, which was about 28%. Bond was a little bit higher. It was like 40%. The exclusion rate, which is the difference in the proportion of black jurors between the veneer as a whole and the jury. We can't measure this because we don't know the makeup of the veneer. And under Abu-Jamal and Lewis, that's enough in itself to reject the Batson claim because it's based on statistics and we don't actually know the significance of the statistics. Only based on statistics, I agree the way you define the different ends that are part of the comparison, that's problematic because there may be dissimilar people in the same end that the calculus is applied to. But you're not suggesting that that should be ignored. It might be one factor to be considered along with a lot of others. Well, at the very least, the same concerns that convinced this court to reject the statistics as insufficiently probative in Abu-Jamal would make it the same statistics be worth very little as proof in ultimately deciding discrimination. And I'll also point out in my brief, and I think this is an interesting point, that at one point during the hearing, Lark's counsel made a proffer about the number of African-Americans on the veneer as a whole. I don't think it was ever introduced into evidence. But if it's true, then the the number of blacks on the veneer and the number of the blacks on the jury itself was almost identical in proportion. And finally, the strike rate, which is the big piece of evidence, 13 out of 15 peremptory strikes used by Mr. Carpenter were against African-Americans. That rate is a tiny bit lower than the strike rate in Williams, which was 88%. It's comparable to the strike rates in Bond, which was 79%, and Lewis in Abu-Jamal, both 67%. And since this is a small sample size, we're only talking one or two jurors, either way. You know, and yet in all of those four cases, this court said that the statistics were inconclusive. And that's the strongest evidence they have. And that's ultimately why I think that relying on, especially the statistics, the juror comparators, where there are obvious race-neutral differences, becomes legally problematic as well as factually problematic. But if we think that the the findings on the comparators is sufficiently strong, that weighs pretty heavily, doesn't it? Does it not, on the totality of the circumstances? Sure, but I my final point is that for the court to say that the comparisons are strong, given the number of race-neutral reasons that are that are identifiable with each juror being compared, this is uncharted territory. Judge Greenberg, anything further? I don't have anything. Okay, we'll give you a call from my chambers, and we'll talk about it. Okay, then I'll hang up then now. Thank you very much.